FILED

2014 Jul-03  AM 09:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **PATRICK AMASON, ENGER** | } | |
| **MCCONNELL, on behalf of themselves** | } | |
| **and all others similarly situated,** | } | |
| | } | |
| **Plaintiffs,** | } | **Case No.:  7:09-CV-02117-RDP** |
| | } | |
| **v.** | } | |
| | } | |
| **THE PANTRY, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Plaintiffs' Motion for Final Approval of Proposed Settlement (Doc. #112), filed on June 19, 2014.  The court preliminarily approved the parties' Settlement Agreement and Release ("Agreement"),[1] which was filed on February 5, 2014. (Doc. #109, Ex. 1).  Also, on July 1, 2014, the court conducted a fairness hearing.  The evidentiary hearing was held pursuant to Federal Rule of Civil Procedure 23(e)(1)(A), which mandates judicial review of any "settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class."  The court has now thoroughly examined and considered (1) the parties' briefs and evidentiary submissions, (2) the arguments and evidence presented at the fairness hearing conducted on June 1, 2014, and (3) the court's own review of the case and procedural record.  For the following reasons, the court finds that the proposed Settlement is fair, reasonable, and adequate, and is due to be approved.  Accordingly, the court will enter Final

---

[1] This Final Judgment incorporates by reference the definitions in the Settlement, and all applicable terms used herein shall have the same meaning as set forth in the Settlement.

Judgment which approves the Settlement in full and the court also makes the findings of fact and conclusions of law set forth below.

## I.      Procedural Background

### A.      The Claims

Plaintiff Patrick Amason filed the original complaint in this action on October 20, 2009. (Doc. #1).  That complaint alleged that The Pantry, Inc.[2] ("The Pantry") willfully violated the Fair and Accurate Credit Transaction Act ("FACTA") by printing more than the last five numbers of the credit or debit card number on receipts provided to its customers at the point of sale; Mr. Amason attached to the complaint a receipt from a Pantry location in Tuscaloosa, Alabama, showing the first four and last four digits of his credit card number.  On September 9, 2010, an amended complaint was filed in the case, adding an additional individual plaintiff, Enger McConnell.  Ms. McConnell alleged that The Pantry provided her with a receipt at an Augusta, Georgia, location that showed all 16 digits of her credit card number.  Both the complaint and the amended complaint sought to certify a nationwide class constituted of similarly situated customers of The Pantry, Inc. who were provided with receipts on which too many numbers were printed.

Following extensive discovery, including the production of tens of thousands of pages of documents and the deposition testimony of seven fact witnesses, one expert witness, and one corporate representative, the Plaintiffs filed a motion to certify two nationwide classes.  These putative classes consisted of all persons in the United States whose credit or debit cards had been used in an in-store transaction at a Pantry location using either of two point-of-sale software systems:  Mr. Amason sought to represent a class of persons who, from June 4, 2009 to the

---

[2] Although the record indicates that this case involves two defendants, Kangaroo Express and The Pantry, Inc., the parties agree that only The Pantry, Inc. is properly subject to suit.  Accordingly, the court will proceed in this opinion as if The Pantry, Inc. is the sole Defendant.

present, had in-store transactions with The Pantry in connection with which Retalix software printed a receipt showing the first-four and last-four digits of the card number; and Ms. McConnell sought to represent a class of persons who, from June 1, 2009 to the present, had in-store transactions with The Pantry in connection with which Gilbarco software printed a receipt with all 16 digits of the card number showing.[3]   On July 25, 2011, after full briefing and a hearing, that motion was denied without prejudice to the Plaintiffs' ability to bring a subsequent class certification motion following additional, limited discovery regarding The Pantry's financial condition.

The Parties completed this additional discovery between July and September of 2011, including the production of more documents and the deposition testimony of an additional corporate representative witness.  Plaintiffs then filed a second class certification motion on October 3, 2011.  In that second motion, Plaintiffs narrowed the class Mr. Amason sought to represent to those persons whose in-store transaction with The Pantry occurred at an Alabama location; the class Ms. McConnell sought to represent was unchanged.  This motion has been the subject of two full rounds of briefing, but it has not been resolved on the merits.

The Parties have also engaged in potentially dispositive motion practice.  The Pantry filed a motion to dismiss, or to stay, the Action on September 20, 2011, arguing that Plaintiffs lacked an injury-in-fact sufficient to confer standing to sue under Article III of the United States Constitution, or in the alternative that the case should be stayed until the United States Supreme Court issued its ruling in *First American Financial Corp. v. Edwards*.  On January 19, 2012, the Court entered an order partially granting The Pantry's motion and staying the case pending a decision in *Edwards*, and administratively terminated both the remaining motion to dismiss and

---

[3] If the Settlement set forth in the Agreement is approved and the Final Settlement Date occurs, Ms. McConnell's claims in the Action will be settled on an individual basis.  *See* Agreement, Section 12.  She is not a member of the Settlement Class.

the Plaintiffs' second motion for class certification.   On June 29, 2012, the United States Supreme Court dismissed the writ of certiorari in *Edwards* as having been improvidently granted.  The court thereafter lifted the stay in this Action, and directed the Parties to re-file any motions that they wished to renew.  The Pantry renewed its motion to dismiss for lack of standing, Plaintiffs renewed their second motion for class certification, and the Parties filed additional briefing regarding both motions.

The court heard oral argument on February 19, 2013, on The Pantry's motion to dismiss for lack of standing.  The court denied that motion, but certified its decision for interlocutory appeal under 28 U.S.C. § 1292.  The Pantry petitioned the Eleventh Circuit to permit an interlocutory appeal of the standing issue, and the Eleventh Circuit accepted the petition on June 25, 2013.  With the appellate proceedings underway, this court stayed the case.  The Pantry had not yet filed its opening brief in the interlocutory appeal when the Parties reached the Settlement.

### B.      The Parties' Settlement Negotiations

The Parties' negotiations leading up to the Settlement were informed by the extensive briefing and argument on class certification issues and the potentially dispositive standing issue, which illuminated the relative strengths and weaknesses of both Parties' positions in the Action. The Parties first mediated the Action with the services of a private mediator in May 2010, before significant discovery had been completed.  That initial mediation ended with the parties at impasse.

Following extensive discovery, class certification litigation, dispositive motion practice, and petition for interlocutory appeal, the Kinnard Mediation Center of the Eleventh Circuit Court of Appeals designated this Action for telephonic mediation.  At the Parties' request, the mediation was converted to an in-person mediation session in Atlanta, Georgia, on September

26, 2013, with Circuit mediator William Roland.  At the Atlanta mediation session, the Parties reached tentative agreement on the Class definition, the compensation that would be paid to individual Class Members, the factual elements to be included on the claim form, and the method for Class Notice, among other things.  While the Parties narrowed their differences on other issues, important elements of the Settlement remained to be agreed to, in particular (and without limitation), the Parties had not agreed on the amount of The Pantry's minimum payment, or maximum liability, under the Settlement. Accordingly, the Parties reconvened with Mediator Roland, by telephone, on or about October 2, 2013 and reached agreement on the minimum and maximum liability for The Pantry under the Settlement.  Only after this agreement was reached did the Parties negotiate and reach agreement on a "not-to-exceed" figure for Class Counsel's attorney's fees.  Plaintiff Patrick Amason, a practicing lawyer, was fully engaged with the negotiations and provided substantial input to Class Counsel about them.

The Parties exchanged drafts of the Agreement memorializing the Settlement, class notices, and the claim forms.  In these and other activities, the Parties invested extensive amounts of time in the negotiation of particular provisions of, and exhibits to, the Agreement.

Ultimately, these negotiations resulted in the execution of the Agreement on or about February 4, 2014, which resolved the action on a class-wide basis, with the exception of attorney's fees.  The Agreement resolves all issues in the case as regards relief to the Class and to the Plaintiffs.

### C.      Structure of the Settlement

The Settlement provides substantial relief for the vast majority of the claimed FACTA violations asserted in Plaintiffs' Amended Complaint.  The Settlement Class, whose members are entitled to claim benefits under the Settlement, is defined as follows:

> [A]ll natural persons residing in the State of Alabama who (1) purchased items inside a store located in Alabama and operated by The Pantry during the Class Period, (2) paid with a debit card or credit card, (3) were responsible for the charges on the debit card or credit card used in the transaction, and (4) received at the point of sale or transaction an electronically-printed receipt showing the first four and last four digits of the card number.  Excluded from the Settlement Class are: (a) The Pantry's board members and executive level officers, including its attorneys; (b) persons who timely and properly exclude themselves from the Settlement Class as provided in this Agreement; (c) persons who, as of the date of entry of the Preliminary Approval Order, have previously executed an individual release of all claims within the scope of the Release proposed by this Agreement; and (d) all federal judges, their spouses, and persons within the third degree of relationship to them.

(Doc. #109, Ex. 1 at 5).  The Settlement provides for cash payments by The Pantry to each Class Member who submits a qualifying claim form.  Those Class Members who submit a qualifying claim form are eligible to receive a cash payment in the amount of $80; those Class Members who submit a qualifying claim form, accompanied by documentation in the form of a receipt or a credit card statement showing a transaction at The Pantry during the Class Period, are eligible to receive a cash payment in the amount of $160.  Further, Class Members may receive additional $160 payments for each transaction for which they can provide the required documentation, provided that the maximum payment available to any one such Class Member is capped at $1,000.[4]  The amounts of the cash payments called for by the Settlement – $80 for the claim-form-only Class Members and $160 for the claim-form-plus-documentation Class Members (subject to a $1,000 cap for any one Class Member) – approximate the statutory damages that would be available to individual claimants who successfully proved a willful FACTA violation at trial, while accounting for the risk factors in this Action.

The claims-made structure of the Settlement was utilized for several reasons.  First, because The Pantry neither gathers nor maintains in the ordinary course of business the names or

---

[4] The amounts of these cash payments are subject to proration downward if the amount available under The Pantry's maximum settlement liability is insufficient to pay all Class claims in these amounts.

addresses of its in-store customers, The Pantry's records do not identify who the Class Members are.  For this reason, it was necessary for notice of the Settlement to be given by publication. Additionally, without making inquiry of persons submitting claims in connection with their claim forms, it was not possible to know whether an individual Class Member actually received a non-compliant receipt at the point of sale, or to confirm that the Class Member used his or her own credit card in the transaction, or to determine that the Class Member was responsible for the charges on the card.  All of these facts must be established in order to conclude that (a) the Claimant is a Class Member as defined in the Settlement and (b) the Class Member has substantiated her FACTA claim.  *See* 15 U.S.C. § 1691c(g).

> ### D.      Notice & Reaction to the Settlement from the Class

Pursuant to the court's Order Preliminarily Approving Settlement and Providing for Notice (Doc. #110), notice was issued to the members of the Settlement Class previously certified in this case. *See* Doc. #112, Exs. 1 & 2.  The Summary Notice led class members to the Settlement Website (www.noticeclass.com/pantrysettlement), where Class Members could access the Notice describing the Settlement terms, containing instructions for completion of a Claim Form (and providing the Claim Form itself), advising them that Class Counsel would seek approval of the Settlement and an award of attorneys' fees and expenses, noting the approval hearing was scheduled for July 1, 2014, and advising them of their right to file objections to the Settlement or opt out on or before May 30, 2014.  The Settlement Administrator, Tilghman & Co., P.C., established a toll-free telephone number and maintained the Settlement Website for use in facilitating class member inquiries.  Additionally, the notice required by the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, was provided to the U.S. and Alabama Attorney Generals.

In response to the Notice plan set out above, there were no objections to the Settlement from class members or governmental actors, and no class members opted out of the Settlement.

### E.     The Fairness Hearing

On July 1, 2014, the court conducted a fairness hearing.  Proper notice of the hearing was provided to all parties and the Class Members.  Nevertheless, no objections were raised at the hearing.

## II.    Analysis of the Fairness, Adequacy, and Reasonableness of the Proposed Settlement

"The court must be exacting and thorough in analyzing whether the settlement is in the best interests of class members."  *Turner v. Murphy Oil USA, Inc*., 472 F. Supp. 2d 830, 843 (E.D. La. 2007) (citing *Manual for Complex Litigation* (Fourth) § 21.61 (2004)).  "The [c]ourt may not resolve contested issues of fact or law, but instead is concerned with the overall fairness, reasonableness, and adequacy of the proposed settlement as compared to the alternative of litigation."  *Turner*, 472 F. Supp. 2d at 843.

### A.     Appropriate and Effective Notice Was Given

The court's Order Preliminarily Approving Settlement and Providing for Notice (Doc. #110) required the dissemination of a legal notice of the settlement to individual Class Members in a form approved by the court. "According to Rule 23(e), the notice must be given 'in a reasonable manner.' ...  'There are no rigid rules to determine whether a settlement notice to class members satisfies constitutional and Rule 23(e) requirements . . . '" *Turner*, 472 F. Supp. 2d at 839 (citing Fed. R. Civ. P. 23(e)(1)(B) and *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 114 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005)).

Here, there are no contentions that notice was not directed in an appropriate and effective manner designed to reach Class Members.   Indeed, there is nothing to suggest that the

procedures used to disseminate the Notice were not proper, leading this court to find the Notice appropriate and effective.

### B.   Class Certification is Warranted

The parties settled this action prior to certification. A class may be certified "solely for purposes of settlement where a settlement is reached before a litigated determination of the class certification issue." *Woodward v. NOR-AM Chem. Co.*, 1996 WL 1063670 *14 (S.D. Ala. 1996) (citing *In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 173-78 (5th Cir. 1979), *cert. denied*, 452 U.S. 905 (1981)).[1]   In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997), the Supreme Court held that because a settlement class action obviates a trial, the district judge deciding whether to certify a settlement class action "need not inquire whether the case, if tried, would present intractable management problems," under Rule 23(b)(3)(D). However, "the settlement context demands undiluted, even heightened attention to unwarranted or overbroad class definitions." *Id.*

Federal Rule of Civil Procedure 23 governs the certification of class actions.   District courts are required to conduct a "rigorous analysis" of that rule's requirements, even when presented with a request for settlement-only class certification. *Amchem Products, Inc.*, 521 U.S. at 620.

> The safeguards provided by Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments – checks shorn of utility – in the settlement class context.   First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind-class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

> Second, if a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed.  Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer, ... and the court would face a bargain proffered for its approval without benefit of adversarial investigation ....
>
> Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted – that if a settlement is "fair," then certification is proper....

*Id*. at 621-22.  This court has extensively considered the issue of whether Plaintiffs satisfy the criteria for class certification, and concludes that the prerequisites of Rule 23(a) have been met and that the proposed class may be certified under subsection (b)(3).

### 1.    Analysis of the Rule 23(a) Factors

Regardless of whether a class is certified for settlement or for trial, the court must determine whether the prerequisites of Rule 23(a) are met: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  The proposed class must also meet the requirements of one of the three class types found in Rule 23(b). In this case, the parties sought certification under Rule 23(b)(3), on the basis that "the questions of law or fact common to the members of the class predominate" over individual issues of law or fact and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b).  Because the undersigned found that the Rule 23(a) and (b) standards were satisfied, the settlement class was preliminarily certified, and notice to putative members of the proposed class was required.

A summary of the court's findings of fact on these issues is warranted on final approval. The numerosity element requires that the members of the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Defendant The Pantry estimates that as many as 275,000 individuals could qualify as Class Members. (Doc. #109 at 15).  Therefore, the court concludes that the class is sufficiently numerous.

The commonality requirement is satisfied when the claims of the prospective class present common questions of law or fact. *See Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 521 (M.D. Ala. 1992).  The court finds that the class allegations in this case involve common issues of fact and law arising out of a common nucleus of operative fact, *i.e.*, whether Defendant's failure to truncate the relevant credit/debit card receipts amounted to violations of FACTA.

Typicality is satisfied where the named plaintiff's claims are sufficiently similar to those of the absent Class Members to conclude that the representative will protect the interests of the class and that there are no antagonistic interests between the representative and the proposed class. *See Coleman*, 141 F.R.D. at 522.  Because The Pantry's alleged violations of FACTA adversely affected Plaintiffs and the other proposed class members "in the same general fashion," the court finds, for purposes of this settlement, that their claims are indeed typical of the claims of the entire class.  *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *see Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 667 (N.D. Ala. 1999) (Putnam, J.) (finding that the typicality prerequisite was satisfied where the plaintiff alleged a harm that was caused by defendant's policies and practices).  Moreover, no evidence has been brought to the court's attention which indicates that there are unusual circumstances or unique facts concerning the claims Amason or McConnell that would render them atypical of the claims of Class Members. Therefore, the court finds that the typicality element is satisfied.

The adequacy requirement of Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc.*, 521 U.S. at 594. To satisfy this requirement, the Plaintiff must demonstrate (1) that "the plaintiff's attorney is qualified, experienced and will competently and vigorously prosecute the suit"; and (2) "that the interest of the class representative is not antagonistic to or in conflict with other members of the class." *Powers v. Government Emples. Ins. Co.*, 192 F.R.D. 313, 317 (S.D. Fla. 1998) (citing *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985)). Plaintiff satisfies both prongs of the adequacy test. Plaintiffs' Counsel are well experienced and have proven their dedication to the Class through their work in this case. In appointing them as Class Counsel, the court considered all of the Rule 23(g) factors and concluded that Class Counsel far surpassed the adequacy requirements of Rule 23(g)(1) and (4). Moreover, Plaintiff has interests entirely aligned with the Class and is sufficiently interested in the case outcome. There are no actual or potential conflicts of interest. Therefore, the adequacy requirement has been met.

### 2.  Analysis of the Rule 23(b) Factors

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Amchem Products, Inc.*, 521 U.S. at 615. In the settlement context of this case, there are no disparate questions undermining class cohesion. The Class Members claim to have been harmed by a common course of conduct – Defendant's alleged violations of FACTA. Plaintiffs allege that the Class Members all suffered harms in the same manner, making it more economical – not only financially for the parties, but also in terms of judicial resources – to settle the claims in one suit. *See Blackie v.*

*Barrack*, 524 F.2d 891, 902 (9th Cir.1975), *cert. denied*, 429 U.S. 816 (1976).  Therefore, the court finds the predominance and superiority elements are satisfied in this case.  Additionally, "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial."  *Amchem Products, Inc.*, 521 U.S. at 620.  Accordingly, certification is appropriate under Rule 23(b)(3).

### C.      Fairness of the Settlement Agreement

"Before approving a class settlement that binds members of the class, the [c]ourt must conduct a fairness hearing at which the parties proposing the settlement must present evidence that the settlement is 'fair, reasonable, and adequate.'" *Turner*, 472 F.Supp.2d at 839 (citing Fed.R.Civ.P. 23(e)(1)(C); *Newby v. Enron Corp.*, 394 F.3d 296, 300-01 (5th Cir. 2004); *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)).

Whether to approve a settlement of a class action lawsuit is a decision "left to the sound discretion of the trial court," and the court understands that its decision will not be overturned "absent a clear showing of abuse of that discretion." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). This makes the court's task of examining this settlement and ensuring its fairness, adequacy and reasonableness all the more critical.

Federal Rule of Civil Procedure 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."  While the Rule does not provide standards for the court to employ in considering a motion for approval, those standards have often been articulated in various reported decisions. When exercising its discretion, the court must consider the public and judicial policies that

strongly favor the settlement of class action lawsuits. *In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *accord Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). "[I]t has been repeatedly recognized that settlements are 'highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits.'" *Bennett v. Behring Corp.*, 96 F.R.D. at 348 (S.D. Fla. 1982) (quoting *Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir.1977) aff'd, 737 F.2d 982 (11th Cir. 1984)). This is the case "particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals." *Patterson v. Newspaper & Mail Delivers' Union*, 514 F.2d 767, 771 (2d Cir. 1975) (citations omitted). Settlements in class action cases are also favored because they "conserve judicial resources by avoiding the expense of a complicated and protracted litigation process....*" In re Motorsports Merch. Antitrust Litig.*, 112 F.Supp.2d 1329, 1333 (N.D. Ga. 2000).

The Eleventh Circuit has instructed that, in examining the fairness, adequacy, and reasonableness of a settlement, a district court should examine several factors, including: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *In re CP Ships Ltd. Securities Litigation*, 578 F.3d 1306, 1317-18 (11th Cir. 2009) (quoting *Bennett*, 737 F.2d at 986 (11th Cir. 1984)). "Thus, the issues that bear upon whether or not to grant final approval here are: a) whether the settlement was procured by collusion among the parties or was the result of arms-length and informed bargaining; and b) whether the proposed final settlement is fair, adequate and reasonable, applying the six Bennett factors." *Lipuma v. American Express*

*Co.*, 406 F.Supp.2d 1298, 1315 (S.D. Fla. 2005). The court addresses each of these issues in turn.

### 1. This Agreement is the Product of Informed, Arms-Length Negotiations

The court has a duty to determine the possible existence of fraud or collusion. In assessing this factor, the words of Judge Lynwood Smith come to mind:

> There is not a scintilla of evidence suggesting that the proposed settlement is the product of fraud, collusion, or otherwise improper conduct. Instead, the record demonstrates that the settlement was negotiated by capable, experienced counsel, in good faith, and at arms' length, following an extensive, lengthy, and difficult process supervised by an experienced mediator. Substantial discovery had been completed in connection with the class certification motion, enabling the parties to fairly assess the risks and rewards of further litigation. ... The parties have represented to the court that the class action settlement was reached through arms' length negotiations over the course of several months, and that it was negotiated in an adversarial manner following substantial factual investigation, extensive legal analysis, expert investigation, and professional mediation. Accordingly, the court finds no evidence of fraud or collusion in the settlement negotiations, or the resulting proposed settlement.

*Carnegie v. Mutual Savings Life Ins. Co.*, 2004 WL 3715446, at *18 (N.D. Ala. 2004). Patrick Amason filed this class action in 2009, claiming that The Pantry willfully violated FACTA by printing more than the last five numbers of the card number on electronically-generated receipts for credit and debit transactions at Pantry stores, and providing those receipts to the cardholders at the point of sale. Thereafter, the parties engaged in extensive discovery and went through three rounds of class certification motions. Following the first completed round and oral argument, the court ordered additional discovery on The Pantry's financial condition. Following that discovery phase, Plaintiff and The Pantry conducted "Round Two" of class certification, involving a truncated class period and scope. During the course of Round Two, The Pantry raised an Article III standing issue, arguing that Plaintiff had not suffered an

"injury-in-fact" and seeking a stay based on the pendency of *First American Financial Corp. v. Edwards* ("*Edwards*"), 132 S. Ct. 2536  (2012), which involved a similar legal issue.  That issue was fully briefed, after which the court stayed consideration of the case pending a disposition of *Edwards.*

After the Supreme Court dismissed as improvidently granted the writ of certiorari in *Edwards*, The Pantry renewed its effort to dismiss based on the standing issue, to which Plaintiff responded.  Plaintiff also filed a renewed and third round of certification papers, to which The Pantry responded. After oral argument on the standing issue, this court denied The Pantry's objection based upon standing but certified the issue for interlocutory appeal.

Once the Eleventh Circuit docketed the case, that court designated the case for mediation with the Eleventh Circuit's Kinnard Mediation Center.  An all-day, in-person mediation was conducted at the Eleventh Circuit on September 26, 2013.  Present were all Class Counsel, The Pantry's counsel and its decisionmakers.  The mediator was William Rowland of the Kinnard Mediation Center.  At the conclusion of that all-day mediation, the parties had reached an outline of settlement terms, but no final agreement was achieved.  In the several ensuing weeks, Class Counsel and The Pantry's counsel had a number of follow-up telephone conferences with Mr. Rowland, following which the parties completed an outline of settlement terms providing relief to class members.  Only at that point, after there had been agreement on all of the material terms of a settlement of the class members' claims, that the parties negotiated the parameters of what would become Class Counsel's request for attorneys' fees and expenses to be paid by The Pantry.

The parties then undertook to memorialize the terms of the Settlement in controlling documents.  That process (involving the preparation of the draft Agreement,

the Notice, the Summary Notice, the Claim Form, and the Motion for Preliminary Approval) took several months.  The parties presented the proposed Settlement to this court on February 5, 2014, after which the court granted preliminary approval to the settlement, conditionally certified the settlement class, and ordered that Notice be disseminated as provided in the Settlement.

Thus, the Settlement that is before the court was only reached after five years of contentious litigation, exhaustive mediation, and hard-fought settlement negotiations.  Indeed, no evidence tending to show fraud or collusion has ever been presented to this court. Accordingly, the court does not hesitate in finding that this Settlement is the product of informed, arms-length negotiations.

**2.**     **The *Bennett* Factors**

**a.**     **The Likelihood of Success at Trial**

"The likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement."  *Lipuma*, 406 F.Supp.2d at 1319.  In evaluating this factor, the court should not reach any ultimate conclusions with respect to issues of fact or law involved in the case.  "The very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise.... [Settlements] could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty."  *Knight v. Alabama*, 469 F.Supp.2d 1016, 1033 (N.D. Ala. 2006) (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981)).

The court has not previously weighed in on the merits, risks, or likelihood of success at trial.  However, the court is familiar with the facts and law of this case, the legal standards that apply to it, and has been very involved in supervising this litigation.  Given this familiarity, the

17

court believes that good cause exists for the parties to wish to resolve their disputes.  To be sure, risks are inherent in all litigation, particularly high stakes lawsuits like this one.  This case is no exception.

Defendant's interlocutory appeal of the standing issue is still outstanding, holding the potential for further delay and uncertainty.  Likewise, the issue of "merits" class certification has yet to be ruled upon, and any such ruling could potentially serve as the basis for a second, time-consuming interlocutory appeal.  *See* Fed. R. Civ. P. 23(f).  Even if a class were certified, significant obstacles stand in the way of Plaintiffs' ultimate success at trial, namely their ability to show that The Pantry's statutory violations were "willful."  Finally, even if Plaintiffs successfully prosecuted their claims to their ultimate conclusion, the record before the court suggests that their recovery may very well be substantially similar to that available under the terms of the Settlement.

Moreover, conducting a class certification hearing, evaluating dispositive motions, and trying this case would not only involve uncertain outcomes at each one of those steps, but also would require a lengthy time commitment from the court and counsel.  And, to say the least, a hearing or trial would not only be lengthy, but logistically complicated and tremendously expensive for all parties. For those reasons, the court concludes that the risks faced by the parties and the difficulty in managing a trial or hearing counsel in favor of accepting the proposed Settlement.

### b.  The Range of Possible Recovery and the Point On or Below the Range of Possible Recovery At Which a Settlement is Fair, Adequate, and Reasonable

District courts often consider the next two factors together because they are related.  *See, e.g., Knight*, 469 F.Supp.2d at 1033; *Lipuma*, 406 F.Supp.2d at 1322; *Behrens v. Wometco*

*Enterprises, Inc.*, 118 F.R.D. 534, 541 (S.D. Fla.1988).  Analysis of these factors requires the court to compare the settlement terms "'with the likely rewards the class would have received following a successful trial of the case.'"  *Knight*, 469 F.Supp.2d at 1033 (quoting *Cotton*, 559 F.2d at 1330). "When making this comparison, the Court should keep in mind that 'compromise is the essence of a settlement,' and 'should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."'" *Knight*, 469 F.Supp.2d at 1033 (citing *Cotton*, 559 F.2d at 1330 (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D. N.Y. 1972))).  Here, as in most class actions, it is not only monetary relief that is difficult to quantify, but the range of possible recovery "'spans from a finding of non-liability through varying levels of injunctive relief.'" *Assoc. for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 468 (S.D. Fla. 2002).

In this case, Plaintiff sought to recover statutory damages under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681n. If they were to prevail, Plaintiff and the Class Members could receive statutory damages ranging from $100 - $1,000.  Under the Settlement, any Class Member who files a completed claim attesting to the salient facts underlying the FACTA claim will receive $80 – 80% of the $100 minimum statutory damages available. A Class Member who submits a Claim Form with Documentation (which the Agreement defines as including either a credit card statement showing the charge in issue, or a copy of the actual receipt underlying the transaction), moreover, will receive $160 per transaction supported with Documentation, plus $80 for any one transaction  claimed  without

Documentation, up to a maximum of $1,000 – equaling the potential maximum amount of statutory damages a Class Member could recover in the event of a total victory.[5]

So, in this Settlement, each Class Member is provided the right to recover from 80% of the minimum statutory damages, up to 100% of the maximum statutory damages. That is nearly as much as, if not all of, the damages a class member could recover in the event of a favorable conclusion - and that recovery is available immediately, without the risks and multi-year delays that further litigation would occasion. That range of recovery almost mimics the range of recovery in the statute, and is, therefore, eminently reasonable.

### c.      The Complexity, Expense, and Duration of Litigation

This inquiry overlaps in some respects the first *Bennett* factor – likelihood of success on the merits. In assessing this factor, "[t]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'" *Lipuma*, 406 F. Supp. 2d at 1323 (quoting *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993)). "'Complex litigation ... "can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive."'" *Lipuma*, 406 F. Supp. 2d at 1323-24 (quoting *Woodward v. NOR-AM Chem. Co.*,

---

[5] The extent of liability for willful violations of FACTA is not entirely clear, largely owing to the statute's ambiguous liability provision. The provision, Section 1681n(a), reads as follows: "Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000." 15 U.S.C. § 1681n(a)(1)(A). Although the provision makes clear that the range of damages is $100 to $1,000, it is silent as to whether such damages (a) are available for each and every willful violation of FACTA, or (b) represent the total amount of damages a consumer may claim, regardless of the number of willful violations that have occurred. This statutory ambiguity presented substantial uncertainty for Plaintiffs (and Defendant) in this case.

1996 WL 1063670 *21 (S.D. Ala. 1996) (*quoting In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir.1992))).

For the reasons already discussed above, this case's legal complexity, potential expense, uncertainty, and already lengthy duration each weigh in favor of approving the proposed Settlement.

### d. The Substance and Amount of Opposition to the Agreement

In assessing whether a proposed settlement is fair, adequate, and reasonable, the court must "examine the settlement in light of the objections raised." *Cotton*, 559 F.2d at 1331. "In assessing the fairness of a proposed compromise, the number of objectors is a factor to be considered but is not controlling." *Id.* "Thus, a low percentage of objections points to the reasonableness of a proposed settlement and supports its approval." *Lipuma*, 406 F. Supp. 2d at 1324 (citing *Bennett*, 737 F.2d at 986).

In accordance with the Agreement and the Court's Order of Preliminary Approval, Class Members received notice of the pendency of this case and the Settlement through the Settlement Website, advertisements running in major Alabama newspapers for multiple weeks, and in-store postings at all locations of The Pantry in Alabama. These hard-copy notices directed Class Members to the Settlement Website, where they could access the Complete Notice and Claim Form, and could view, if Class Members so desired, a complete copy of the Agreement and other case-related documents. Finally, as required by CAFA, 28 U.S.C. § 1715, notice of the Settlement was sent to appropriate federal and state officials, so that those offices would have an opportunity to review the Settlement and object if they deemed it appropriate.

In response to the Notice program approved by the court, no class member objected to the settlement, no class member opted out of the settlement, and no federal or state official objected to the settlement.  These facts weigh heavily in favor of the fairness, reasonableness, and adequacy of the Settlement. *Maher v. Zapata Corp.,* 714 F.2d 436, 456 n.3 5 (5th Cir. 1983); *In re Warner Communications,* 618 F. Supp. at 746; *Ressler v. Jacobson,* 822 F.Supp. 1551, 1556 (M.D. Fla. 1992).

> **e.      The Stage of Proceedings at Which the Settlement Was Achieved**

Before entering into serious settlement discussions, the parties engaged in significant discovery, extensive motion practice, and intense mediation at the appellate level.  Given these circumstances, the court has no hesitation in finding that the parties and their counsel have sufficiently developed the facts and gained sufficient understanding of the merits of the case prior to entering into the proposed Settlement.  Thus, this factor also counsels in favor of approving the proposed Settlement.

> **D.      Propriety of Incentive Payment to Class Representative Amason**

As part of their Motion for Final Approval of the Proposed Settlement (Doc. #112), Plaintiffs ask the court to award Class Representative Patrick Amason a $5,000 incentive payment. (Doc. #112 at 19-21).  This amount reflects what was contemplated by the parties in the Agreement, which states, "The Parties has also agreed that Class Counsel shall be entitled to apply to the Court for an Incentive Award to Plaintiff Amason not to exceed $5,000, and that The Pantry will not object to any application by Class Counsel for an Incentive Award to Plaintiff Amason of up to that amount." (Doc. #109, Ex. 1 at 16).

Incentive payments to named class representatives are fairly customary.  Indeed, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they

22

provide and the risks they incurred during the course of the class action litigation." *Ingram v. The Coca-Cola Company*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (internal quotations and citations omitted) (approving service awards of $300,000 to each named plaintiff in recognition of the services they provided to the class by responding to discovery, participating in the mediation process, and taking the risk of stepping forward on behalf of the class).

Courts have frequently found it appropriate to specially reward named class representatives for the benefits they have conferred on the class, often in greater amounts than that sought here. *See Allapattah Servs, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218-19 (S.D. Fla. 2006) (collecting cases in which courts approved class representative incentive awards ranging between $1,500 and $25,000); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007) (approving $7,500 awards to three representative plaintiffs); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250-51 (S.D. Ohio 1991) ($50,000 to each of 6 class representatives, for an aggregate award of $300,000)*; In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (two incentive awards of $55,000, and three incentive awards of $35,000); *Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27, 33 (E.D. Pa.1985) (incentive awards of $20,000 to each of two plaintiffs).

An amount of distribution to Amason greater than that of a class member and made in the form of an incentive payment is appropriate here because such an award is "rationally based on legitimate considerations." *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983). To be sure, the incentive payment proposed in this case is not shrouded by a "cloud of collusion." *See Holmes*, 706 F.2d at 1148. Rather, Amason's service as Class Representative (1) protected the interests of class members and others; (2) resulted in substantial benefit to Class

Members; (3) and required significant time and effort.  *See Carnegie v. Mutual Sav. Life Ins. Co.*, 2004 WL 3715446, * 24 (N.D. Ala. 2004) (citing *Spicer v. Chicago Board Options Exchange, Inc.*, 844 F. Supp. 1226, 1266 (N.D. Ill. 1993) (setting forth "legitimate considerations" which dispel a "cloud of collusion").  In fact, Class Counsel have repeatedly represented to the court, in both their written submissions and at the fairness hearing held on July 1, 2014, that Class Representative Amason, who is a practicing attorney, made significant contributions to the settlement process, particularly through his participation in the drafting of the Complaint and subsequent amendments, his participation in responding to Defendant's various submissions, his review of discovery responses, and his cooperation in sitting for a lengthy deposition. *See* Doc. #112 at 20.

        In light of the work and service Amason has performed on behalf of Class Members, the risks he undertook, and his contributions to the Settlement, the court finds that the requested incentive payment of $5,000 is reasonable, appropriate, and due to be approved.[6]

**III.    Conclusion**

        Based on the foregoing analysis, the court will enter a separate order which:

1.        Appoints Patrick Amason as Class Representative;

2.        Appoints Steven L. Nicholas of Cunningham Bounds, LLC, Wilson F. Green of Fleenor & Green LLP, Bryan E. Comer of Tobias & Comer, LLC, and Dustin J. Fowler of Buntin, Etheredge & Dowling as Class Counsel;

3.        Approves the proposed Settlement, attached as Exhibit 1 to Plaintiffs' Motion for Preliminary Approval  of Proposed Settlement (Doc. #109), and finds that the

---

[6] To be sure, this court has previously denied incentive payments to class representatives when appropriate. Here, there is no reason to do so.

Settlement is fair, adequate, and reasonable, and not the product of collusion among the parties;

4.      Approves Plaintiffs' request for a $5,000 incentive payment to Class Representative Patrick Amason.

5.      Authorizes and directs the parties to consummate and to fully comply with the Settlement in accordance with its terms and provisions;

6.      Finds that the Named Plaintiffs and each of the Class Members shall be deemed to have, and by operation of this Final Judgment shall have, fully, finally, and forever released the Released Claims in accordance with the terms of the Agreement;

7.      Enjoins the Named Plaintiffs, all Class Members, their counsel and anyone claiming through or for the benefit of any of them, from commencing, prosecuting, instituting, continuing, or in any way participating in the commencement or prosecution of any Suit asserting any of the Released Claims against the Released Parties, either directly, representatively, or in any other capacity;

8.      Orders that this action shall be dismissed with prejudice;

9.      Finds that except as expressly provided in the Settlement, each of the parties, including each Class Member, shall bear his/her/its own costs, fees, and expenses; and

10.     Retains jurisdiction to enforce the terms of the settlement agreement.

**DONE** and **ORDERED** this ____3rd____ day of July, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE